[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-12804
Non-Argument Calendar
_____

D.C. Docket No. 3:10-cr-00043-MCR-9


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ERNEST MALLETY,
a.k.a. Pops,
a.k.a. Cooneye,

Defendant-Appellant.


_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(November 14, 2012)

Before HULL, JORDAN and ANDERSON, Circuit Judges.

PER CURIAM:

After a jury trial, Ernest Mallety was convicted on these three counts: (1) conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(b)(1)(A)(ii) and 846; (2) conspiracy to use a cellular telephone to facilitate a drug offense, in violation of 21 U.S.C. §§ 843(b) and 846; and (3) possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A).  Mallety appeals his convictions on Counts 1 and 3.  After review, we affirm Mallety's convictions.

## I.  BACKGROUND

Defendant Mallety and eleven codefendants were indicted on charges related to their trafficking cocaine from Houston, Texas, to Pensacola, Florida, between January 2008 to March 2010.  Several of Mallety's codefendants pled guilty and cooperated with the government.  Mallety was tried alone.

## A.  Codefendants' Testimony

Six of Mallety's codefendants—including Tracy Hull, Douglas Jones, Terry Dunning, Jason Green, and Kevin Mallety, Defendant Mallety's son—testified at Mallety's trial.[1]  According to the codefendants, Hull and Jones began transporting

---

[1] Unless otherwise indicated, all references to "Mallety" in this opinion refer to Defendant Ernest Mallety, rather than his son, codefendant Kevin Mallety.

cocaine from Houston to Pensacola in 2007. Soon thereafter, Hull and Jones began paying Mallety to transport the cocaine. Mallety transported two to four kilograms of cocaine each trip and made one or two trips per week. Mallety was paid $1000 per kilogram. Hull wrapped the cocaine in plastic wrap and fabric softener to prevent police dogs from smelling it. The cocaine was then concealed in the side panels of Mallety's black Nissan truck.

Defendant Mallety communicated with Hull, Dunning and others via cell phone, and Hull would call Mallety to help him avoid being stopped by police. Dunning testified that when he and Mallety discussed various numbers over the phone, they were referring to ounces of cocaine.

Kevin Mallety testified that Defendant Mallety, his father, possessed two guns, a 9mm and a .380. Codefendant Jason Green testified that Mallety carried his gun in the side door panel or the glove compartment of his truck to protect the money and drugs. On March 22, 2010, police searched Mallety's house. The police found a 9mm pistol and a receipt for a .380 handgun.

## B. DEA Agent Sonya Bryant's Testimony

Drug Enforcement Administration ("DEA") Special Agent Sonya Bryant investigated Mallety and the codefendants using physical surveillance, video surveillance and court-authorized cell phone wiretaps. At trial, the government

3

asked Agent Bryant what her investigation revealed, and she stated:

> The investigation revealed that Tracy Hull and Douglas Jones were working in partnership and leading the organization, where they were obtaining cocaine from Houston . . . . They were utilizing [Mallety] to transport the cocaine from Houston to Pensacola.

Agent Bryant further testified that she monitored and recorded wiretaps on three cell phones, two belonging to Mallety and one to Hull, for a total of 30 days. The government played several of these recorded cell phone conversations for the jury. In some of these recordings, Mallety mentions needing or carrying a gun in connection with his drug trafficking. For example, Mallety is heard saying, "the next mother fucker that rob me, be dead . . . cause from now on out I'm carrying my gun everywhere I go . . . laying right there on my seat."

In the recordings, Mallety is also heard speaking with various codefendants and others about cocaine. For example, in one recording, Mallety is heard saying, "But like I said if you was to took uh uh 3 grams out of each ounce. You still woulda made money off of it. And put 3 grams of baking soda in there you still made money off of 'em."

The speakers in the recorded conversations rarely referenced cocaine explicitly. Rather, they used veiled language. For example, in one recording, Mallety asked one codefendant, "What you got left?" The codefendant responded,

4

"Uhh . . . I think I got about, bout 5 of 'em left." In another conversation, Mallety asks a codefendant, "You don't know anybody else needs something?" and then says, "Oh okay um cause I have about ten or twelve of them."

After the jury heard the recordings, the government asked Agent Bryant to explain the speakers' use of numerical terms. Mallety's counsel objected based on "speculation and lack of foundation." The district court sustained this objection.

The government then proffered Agent Bryant as an expert "in the area of drug distribution, terminology and distribution chains." Agent Bryant testified that she had been a DEA special agent for over 19 years and that she had been involved in over 500 narcotics investigations. Agent Bryant had received training from the DEA in narcotics street terminology and distribution patterns. Mallety's counsel objected to Bryant's testifying as an expert. The district court then asked Mallety's counsel whether he wanted to voir dire Agent Bryant. Mallety's counsel declined, and the district court designated Agent Bryant as an expert. The district court then instructed the jury:

> a person having special training or experience in [a] specialized matter is permitted to . . . state an opinion about that matter. Merely because such a witness has expressed an opinion, however, does not mean that you must accept the opinion, the same as with any other witness. It's up to you to decide on whether or not to rely upon the testimony and the opinion.

5

The government asked Agent Bryant, based on her "training and experience," to explain the numerical references that Mallety, his codefendants and others used in the recorded cell phone conversations. Agent Bryant stated that the speakers were referring to ounces of cocaine and identified eight such instances. Agent Bryant also explained various cocaine-related terms Mallety and his codefendants used.

In addition to explaining the numerical references, Agent Bryant explained what Mallety and the codefendants were talking about in at least four audio recordings. In the first recording, Mallety is heard planning to meet another codefendant at Hull's house after the codefendant told Mallety he wanted "three of em." The government asked Agent Bryant, "based on your training and experience in this investigation, when [Mallety] and [the] codefendant . . . are talking about getting three of them and meeting at [Hull's] house, what are they discussing?" Agent Bryant answered, "That [the codefendant] wants three ounces of cocaine and they agreed to meet at Tracy Hull's residence . . . in Pensacola."

In the second recording, Mallety tells Hull that someone "was a hundred dollars short on that." Hull responds, "Alright shit I get it to ya." Agent Bryant explained that, in this recording, "[t]hey're discussing that [Mallety] had met with Jason Green and that Jason Green and [Mallety] had counted the money, and the

6

money was short an amount, and Tracy Hull said he would make up the difference in the money."

In the third recording, Hull is heard telling Mallety, "Hey it's four of em at that ah 54 I think it said the 54, the 54 mile exit. . . . [I]t's four of em sitting right there." Agent Bryant testified that, in this recording, "Codefendant Tracy Hull was warning [Mallety] of the presence of law enforcement personnel around the Exit 54 in Alabama to avoid detection because [Mallety] was transporting cocaine."

In the fourth recording, Mallety is heard explaining that the police had searched his truck and found $13,000 under the back seat. Agent Bryant explained that, in this recording, Mallety was "discussing the vehicle stop and also that law enforcement personnel didn't seize all the money that was in the vehicle."

After the district court designated Agent Bryant as an expert, Mallety did not object to any of Agent Bryant's testimony regarding the recorded conversations.[2]

## C. Convictions

---

[2] Midway through Agent Bryant's testimony, and after the district court qualified Agent Bryant as an expert, the district court, in a <u>sua</u> <u>sponte</u> bench conference, expressed concern about the scope of Agent Bryant's testimony. The district court did not identify what specific testimony raised its concern. The district court explained that while the jury may need an expert to interpret the drug terminology used in the recorded conversations, Agent Bryant was "interpreting—giving her opinion of the import of their conversation[s], and I'm not sure that that's proper." At the bench conference, Mallety's counsel stated, "I was going to object to the explanation." However, Mallety's counsel did not actually object to Agent Bryant's testimony either before, during or after the bench conference.

Mallety presented no evidence in defense.  After the government and Mallety rested, Mallety moved for a judgment of acquittal on all counts.  Mallety's counsel offered no argument on the motion, and the district court denied it.

The jury convicted Mallety on all three counts.  The district court sentenced Mallety to 175 months' imprisonment on Count 1 and 48 months' imprisonment on Count Two, to run concurrently.  The district court sentenced Mallety to 60 months' imprisonment on Count Three, to run consecutively, which yielded a total sentence of 235 months' imprisonment.

Mallety now appeals.

## III.  DISCUSSION

### A.  Agent Bryant's Testimony

Mallety first argues that "the frequency and extent of Agent Bryant's impermissible expert opinion . . . usurped that analytical and deliberative function of the jury."  Mallety identifies several instances in which Agent Bryant allegedly "beyond merely interpreting drug jargon, drug code words or the inner working of a drug organization" with reference to the recorded conversations and testified regarding the "ultimate issue" of Mallety's participation in a drug conspiracy.  Specifically, Mallety cites Agent Bryant's testimony (1) that the numerical references in the recorded conversations referred to ounces of cocaine; (2) that

8

Mallety participated in a drug-running organization led by Hull and Jones; and (3) interpreting the communications in the four recorded conversations described above. Mallety claims that this testimony deprived him of a fair trial as to Count 1.

Notably, Mallety concedes that we review this issue for plain error because he did not object to Agent Bryant's testimony at trial.[3] Federal Rule of Evidence 702 permits expert testimony if "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). "[W]e have recognized the well established rule that an experienced narcotics agent may testify as an expert to help a jury understand the significance of certain conduct or methods of operation unique to the drug distribution business." United States v. Garcia, 447 F.3d 1327, 1335 (11th Cir. 2006) (internal quotation marks omitted); accord United States v. Emmanuel, 565 F.3d 1324, 1335 (11th Cir. 2009); United States v. Brown, 872 F.2d 385, 392 (11th Cir. 1989). Such testimony "is not objectionable just because it embraces an ultimate issue." Fed. R.

---

[3] This Court reviews for plain error issues not raised below. United States v. Turner, 474 F.3d 1265, 1275 (11th Cir. 2007). Under plain-error review, there must be (1) an error, (2) that is plain, and (3) that affects substantial rights. Id. at 1276. If these three prongs are met, this Court may exercise its discretion to notice the error if it seriously affects the fairness, integrity, or public reputation of judicial proceedings. Id. For an error to be plain, it must be obvious or clear under current law. United States v. Baker, 432 F.3d 1189, 1207 (11th Cir. 2005). For an error to affect substantial rights, "in most cases it means that the error must have been prejudicial: It must have affected the outcome of the district court proceedings." United States v. Olano, 507 U.S. 725, 734, 113 S. Ct. 1770, 1778 (1993).

Evid. 704(a); see United States v. Milton, 555 F.2d 1198, 1203 (5th Cir. 1977).[4]

However, we have recognized that "[a]lthough courts often approve of testimony

interpreting drug code words, such expert testimony may unfairly provide the

government with an additional summation by having the expert interpret the

evidence, and may come dangerously close to invading the province of the jury."

Emmanuel, 565 F.3d at 1335–36.

Given the extensive recordings and the length of Agent Bryant's

investigation, Mallety has not shown that the district court plainly erred by failing

to exclude any of Agent Bryant's testimony.  First, the district court did not err by

permitting Agent Bryant to give her opinion as to the meaning of specific terms,

such as numbers, that Mallety and others used in the recorded conversations.  An

expert witness may testify to the meaning of specific terms used in recorded

conversations.  Emmanuel, 565 F.3d at 1336 (holding that the district court did not

err by admitting an expert law enforcement officer's testimony that the codes and

jargon heard in the defendant's recorded conversations referred to drug

trafficking); Brown, 872 F.2d at 392 (holding that the district court did not abuse

its discretion by admitting an expert FBI agent's testimony that code words heard

---

[4] Decisions by the former Fifth Circuit issued before October 1, 1981 are binding precedent in the Eleventh Circuit.  Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

in the defendants' recorded conversations referred to cocaine sales).  Agent

Bryant's testimony with respect to the meaning of the numbers in the recorded

conversations is materially indistinguishable from the expert testimony regarding

specific terms in Emmanuel and Brown.

Next, the district court did not plainly err by permitting Agent Bryant to

testify that Hull and Jones "were working in partnership and leading the

organization, where they were obtaining cocaine from Houston . . . . [and] were

utilizing [Mallety] to transport the cocaine from Houston to Pensacola."  As an

initial matter, we note that Agent Bryant's testimony did not comment on the

"ultimate issue" of whether Mallety knowingly joined a particular drug conspiracy.

A conviction for conspiracy requires proof "that the defendant knowingly and

voluntarily joined the conspiracy."  United States v. Garcia, 405 F.3d 1260, 1269

(11th Cir. 2005).  Agent Bryant merely testified to her informed, factual

observation that Hull and Jones were "utilizing [Mallety] to transport the cocaine,"

not that Mallety had the requisite knowledge or volition to sustain a conspiracy

conviction.  To the extent a jury might arguably infer from that testimony first that

Mallety must have known what he was transporting and then second that Mallety

must have knowingly agreed to be part of a conspiracy, we cannot say

11

any error was plain to the district court at the time of trial, which is required to meet the second prong of the plain error test.

Finally, Mallety is correct that Agent Bryant at times interpreted not just specific terms but the meanings of the recorded conversations as a whole. However, permitting this testimony was not plain error because, in light of the volume and nature of the evidence showing Mallety conspired to distribute and possess cocaine,  Agent Bryant's testimony did not affect Mallety's substantial rights.  See id. at 1336.  The evidence against Mallety included the testimony of numerous coconspirators, including Mallety's own son, and recorded conversations between Mallety and the codefendants, in which Mallety himself discussed cocaine and described in clear terms both driving from Texas to Florida and his efforts to avoid the police and federal agents.  Terry Dunning testified that when he and Mallety discussed various numbers over the phone, they were referring to ounces of cocaine.  In addition, the district court properly instructed the jury, without objection from Mallety, that it was free to accept or reject Agent Bryant's expert testimony.  The instruction read:

> a person having special training or experience in [a] specialized matter
> is permitted to . . . state an opinion about that matter.  Merely because
> such a witness has expressed an opinion, however, does not mean that
> you must accept the opinion, the same as with any other witness.  It's
> up to you to decide on whether or not to rely upon the testimony and

12

the opinion.

"A jury is presumed to follow the instructions given to it by the district judge." United States v. Ramirez, 426 F.3d 1344, 1352 (11th Cir. 2005).

In sum, Agent Bryant's testimony as to the meaning of the conversations was not essential to Mallety's conviction.  See Emmanuel, 565 F.3d at 1336 (concluding that defendant's substantial rights were not affected by police officer's interpretation of recorded conversations because, in light of the substantial evidence, "the jury could have easily interpreted the recorded conversations as involving drugs based on other evidence in the case, including actual seizures or drugs and drug money and testimony from coconspirators").  Accordingly, Mallety has failed to show that any error "affected the outcome of the district court proceedings."  United States v. Olano, 507 U.S. 725, 734, 113 S. Ct. 1770, 1778 (1993).

## B.  Sufficiency of the Evidence as to Count 3

Next, Mallety claims that the evidence was insufficient to convict him on Count 3, possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A).[5]  To prove possession of a firearm "in

---

[5] Mallety's opening brief argues that the evidence was insufficient to convict him for using or carrying a firearm during and in relation to a drug crime.  However, the jury's special verdict form shows that the jury convicted Mallety of "possessing a firearm in furtherance of a

13

furtherance of" a drug crime under § 924(c)(1)(A), the government must show that "the firearm helped, furthered, promoted, or advanced the drug trafficking." United States v. Mercer, 541 F.3d 1070, 1076 (11th Cir. 2008) (internal quotation marks omitted).[6] "A conviction is properly supported by a showing of some nexus between the firearm and the drug selling operation. The nexus may be established by the kind of drug activity that is being conducted, accessibility of the firearm, . . . whether the firearm is loaded, [and] proximity of the firearm to the drugs or drug profits . . . ." Id. at 1076–77.

The evidence at trial was amply sufficient for a jury to conclude beyond a reasonable doubt that Mallety possessed a firearm in furtherance of a drug crime. Codefendant Green testified that Mallety carried a gun with him to protect the drugs and money. In addition, the jury heard Mallety say in a recorded conversation that "from now on out I'm carrying my gun everywhere I go . . . laying right there on my seat." In that same conversation, Mallety had discussed

drug-trafficking crime" and not "using or carrying a firearm during and in relation to a drug-trafficking crime." We thus construe Mallety's argument as challenging the sufficiency of the evidence for the crime for which he was convicted.

[6] This Court reviews de novo whether evidence was sufficient to sustain a jury verdict. United States v. Jimenez, 564 F.3d 1280, 1284 (11th Cir. 2009). The evidence is "viewed in the light most favorable to the government," with "all reasonable inferences and credibility choices made in the government's favor." United States v. Frank, 599 F.3d 1221, 1233 (11th Cir. 2010) (internal quotation marks omitted).

14

cocaine selling and trafficking.  Codefendant Kevin Mallety, Defendant Mallety's son, testified that his father possessed two guns, a 9mm and a .380.  Finally, the search of Mallety's house recovered a 9mm pistol and a receipt for a .380 handgun.  The evidence clearly permitted the jury to conclude that Mallety both possessed a firearm and that his possession of the firearm furthered a drug crime.

## III.  CONCLUSION

For the foregoing reasons, we affirm Mallety's convictions.  However, we remand for the limited purpose of correcting the clerical error in the written judgment.  The judgment should strike the reference to cocaine base and to 21 U.S.C. § 841(b)(1)(A)(iii) in Count 1.[7]

**AFFIRMED WITH LIMITED REMAND.**

---

[7] Count 1 charged that Mallety conspired to possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 841(b)(1)(A)(ii), and 50 grams or more of cocaine base, in violation of 21 U.S.C. § 841(b)(1)(A)(iii).  Midway through Mallety's trial, the government advised that its evidence would be limited to powder cocaine and requested that the district court "strike cocaine base from the particular [jury] instructions and then from the verdict form."  Mallety's counsel did not object, and the district court complied.

The district court properly omitted references to cocaine base from the jury instructions and verdict form.  However, Mallety's written judgment erroneously included the reference to cocaine base and 21 U.S.C. § 841(b)(1)(A)(iii) in Count 1.  "[I]t is fundamental error for a court to enter a judgment of conviction against a defendant who has not been charged, tried, or found guilty of the crime recited in the judgment."  United States v. James, 642 F.3d 1333, 1343 (11th Cir.), cert. denied, 132 S. Ct. 438 (2011).  Accordingly we remand to the district court for the limited purpose of striking the reference to cocaine base and to 21 U.S.C. § 841(b)(1)(A)(iii) in Count 1 of Mallety's judgment.  The reference to five or more kilograms of cocaine and 21 U.S.C. § 841(b)(1)(A)(ii) should remain.

15

JORDAN, Circuit Judge, concurring:

With one exception, I join the panel's opinion. As to that exception—the testimony of Agent Bryant that Mr. Mallety's codefendants "were utilizing" him to transport cocaine from Houston to Pensacola—I concur in the judgment because that testimony did not affect Mr. Mallety's substantial rights. I write separately to emphasize the dangers that can surface when a case agent, who testifies as both a code-interpreting expert and a fact witness, expresses an opinion that the defendant was engaged in wrongdoing.

"'[P]articular difficulties, warranting vigilance by the trial court, arise when an expert, who is also the case agent, goes beyond interpreting code words and summarizes his beliefs about the defendant's conduct based upon his knowledge of the case.'" *United States v. Emmanuel*, 565 F.3d 1327, 1335 (11th Cir. 2009) (quoting *United States v. Dukagjini*, 326 F.3d 45, 53 (2d Cir. 2003)). There are a number of reasons to guard against this kind of editorializing, including the possibility that an agent's testimony may overtake the jury's job. *See id.* at 1336 (noting that such testimony "may come dangerously close to invading the province of the jury"). After all, as we recognized decades ago, there is "no practice under which [a government-agent witness] should [be] permitted to express his opinion as to the guilt of the [defendant]." *Gibson v. United States*, 363 F.2d 146, 147 (5th

16

Cir. 1966). *See also United States v. Gonzalez*, 414 F. App'x 189, 200 (11th Cir. 2011) ("[A] government witness may not offer an opinion as to whether the defendant committed the offenses with which he is charged."); *United States v. Blackburn*, 398 F. App'x 453, 466 (11th Cir. 2010) (characterizing such testimony as "improper").

But potential encroachment into the jury's role is not the only danger associated with a case agent who gives dual-purpose testimony; the Second Circuit, in *Dukagjini*, provides another: "[T]here is a high risk that when a case agent/expert strays from the scope of his expertise, he may impermissibly rely upon and convey hearsay evidence." 326 F.3d at 55. *Cf. Gibson*, 363 F.2d at 148 (concluding that an agent's testimony about others' observations, which the agent relayed while describing the results of his investigation, was improper hearsay). Indeed, "[a]s the testimony of the case agent moves from interpreting individual code words to providing an overall conclusion of criminal conduct, the process tends to more closely resemble the grand jury practice, improper at trial, of a single agent simply summarizing an investigation by others that is not part of the record." *Dukagjini*, 326 F.3d at 54.

These already-significant hazards are compounded when an agent offers this dual testimony as an "overview witness." *See, e.g.*, *United States v. Griffin*, 324

17

F.3d 330, 349 (5th Cir. 2003) (describing "overview witness" as one "put on the stand to testify before there has been any evidence admitted for the witness to summarize . . . to paint a picture of guilt"). It is easy to see why putting a case agent's hybrid testimony in the lead-off spot heightens its dangerous effect: there are very real risks that evidence intended to support the agent's conclusions may not materialize and that the jury "may place greater weight on evidence perceived to have the imprimatur of the government." *United States v. Casas*, 356 F.3d 104, 120 (1st Cir. 2004). And I am not alone in my concern about the trouble this tactic creates; every other circuit to address the use of government overview witnesses in this context has condemned the practice. *See, e.g.*, *United States v. Moore*, 651 F.3d 30, 54-61 (D.C. Cir. 2011); *United States v. Garcia*, 413 F.3d 201, 210-17 (2d Cir. 2005); *Casas*, 356 F.3d at 119-20; *Griffin*, 324 F.3d at 349-50.

Agent Bryant's opinion that Mr. Mallety was being used by his codefendants to transport cocaine, in my view, was improper, as it likely would have been understood by the jury as evidence that Mr. Mallety was a knowing participant. But given the other evidence against Mr. Mallety, there was no plain error.