[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-11560

_____

D.C. Docket No. 2:15-cr-00335-RDP-TFM-9

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JAMES MARVIN HAWKINS,
a.k.a. "D",
WALLACE EUGENE MCCREE, III,
a.k.a. "Petey",

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Middle District of Alabama

_____

(August 20, 2019)

Before TJOFLAT and NEWSOM, Circuit Judges, and ANTOON,* District Judge.

ANTOON, District Judge:

_____

* Honorable John Antoon II, United States District Judge for the Middle District of Florida,
sitting by designation.

A jury found James Marvin Hawkins and Wallace Eugene McCree, III, guilty of conspiring to distribute cocaine and committing other related offenses. In this consolidated appeal, Hawkins and McCree challenge their convictions and sentences on multiple grounds. They principally argue that the Government's main witness—George Russell, the lead case agent—gave improper opinion testimony at trial. Although the rest of Hawkins's and McCree's arguments are without merit or need not be reached, we conclude that the allowance of Agent Russell's testimony—which was speculative and included improper commentary on the evidence—constitutes plain error. Thus, we affirm in part, vacate in part, and remand for further proceedings.

## I. Background

Beginning in November 2014, the Drug Enforcement Administration (DEA) conducted a lengthy investigation of cocaine distribution in Montgomery, Alabama, initially targeting Joshua Jackson. Naturally, the DEA agents were interested in determining the source of Jackson's cocaine supply and the scope of his operation. To collect that information, the agents employed various means. In the beginning, they used confidential informants to conduct controlled buys of cocaine from Jackson. But as the investigation continued, the agents also obtained five wiretap authorizations from a district judge. Pursuant to those authorizations,

2

the agents intercepted between 20,000 and 25,000 conversations on six "target telephones." Through the intercepted conversations, the agents identified Carlos Ware as Jackson's cocaine supplier, McCree and Hawkins as distributors for Ware, and others who played various roles in the operation.

The recorded conversations also led to traffic stops of some of the suspected conspirators. For example, after agents intercepted text messages indicating that Ware was on his way to Georgia to purchase 8 to 9 kilograms of cocaine, the agents contacted Alabama state troopers. The troopers responded, stopped Ware as he was traveling on Interstate 85, and seized $299,920 in cash from Ware's vehicle.[1] A few weeks later, DEA agents intercepted a telephone conversation between McCree and Ware, causing the agents to believe that McCree was transporting cocaine. The agents contacted Montgomery police officers, who then followed McCree as he drove south on Interstate 65 and pulled him over when he changed lanes without signaling. During the stop, a search of McCree's car uncovered nine ounces of cocaine, a cutting agent called Inositol, marijuana, and a firearm.

Two months after McCree's traffic stop, a grand jury indicted Hawkins,

---

[1] According to trial testimony, the going rate in the area for a kilo of cocaine was approximately $34,000 at that time.

3

McCree, Jackson, Ware, and seven others on a charge of conspiracy to distribute cocaine. The grand jury later returned a 26-count superseding indictment adding various charges against the individual defendants. In addition to conspiracy,[2] the superseding indictment charged Hawkins with use of a communication facility in furtherance of the conspiracy[3] and attempted possession with intent to distribute cocaine.[4] The additional charges against McCree were possession with intent to distribute cocaine[5]; three offenses arising from the traffic stop—possession with intent to distribute cocaine,[6] possession of a firearm in relation to a drug-trafficking crime,[7] and possession of a firearm by a convicted felon[8]; and three other offenses allegedly committed on the day of his arrest on the conspiracy charge—possession of marijuana with intent to distribute,[9] possession of a firearm in relation to a drug-trafficking crime,[10] and possession of a firearm by a convicted felon.[11]

Several of the defendants, including Hawkins and McCree, filed pretrial

[2] 21 U.S.C. § 846 (Count One)
[3] 21 U.S.C. § 843(b) (Count Nine)
[4] 21 U.S.C. § 841(a)(1), 18 U.S.C. § 2 (Count Fourteen)
[5] 21 U.S.C. § 841(a)(1), 18 U.S.C. § 2 (Count Fifteen)
[6] 21 U.S.C. § 841(a)(1), 18 U.S.C. § 2 (Count Sixteen)
[7] 18 U.S.C. § 924(c)(1)(A)(i) (Count Seventeen)
[8] 18 U.S.C. § 922(g)(1) (Count Eighteen)
[9] 21 U.S.C. § 841(a)(1) (Count Twenty-Four)
[10] 18 U.S.C. § 924(c)(1)(A)(i) (Count Twenty-Five)
[11] 18 U.S.C. § 922(g)(1) (Count Twenty-Six)

4

motions to suppress the evidence obtained from the wiretaps, and McCree also moved to suppress evidence seized during the traffic stop.  After holding an evidentiary hearing, the assigned magistrate judge recommended that the district court deny the motions.  The district court followed that recommendation.

All the other defendants pleaded guilty, but Hawkins and McCree proceeded to trial.  After hearing three days of testimony—most of it from Agent Russell— the jury found Hawkins guilty on all three counts against him.  The jury acquitted McCree on two counts[12] but found him guilty on the other six counts with which he was charged.  The district judge sentenced Hawkins to 170 months in prison and McCree to 196 months.  Hawkins and McCree now timely appeal their convictions and sentences.

## II. Discussion

In addition to their argument that much of Agent Russell's testimony was improper, Hawkins and McCree present an array of issues.  Both argue that the district court erred in denying the motions to suppress.  Hawkins additionally complains that the evidence presented at trial constructively amended the superseding indictment and resulted in a material variance.  He also challenges the sufficiency of the evidence on each of the three charges against him.  And both

---

[12] Counts Twenty-Four and Twenty-Five.

5

Hawkins and McCree maintain that the district court committed errors in calculating their sentencing guideline ranges and that the sentences imposed were substantively unreasonable.

### A.    Denials of Motions to Suppress

#### 1. Wiretap Evidence (Hawkins and McCree)

Hawkins and McCree assert that evidence obtained pursuant to the wiretap authorizations should have been suppressed because the wiretap applications did not meet the necessity requirement of 18 U.S.C. § 2518.  "A district court's denial of a motion to suppress evidence is reviewed as a mixed question of law and fact, with the rulings of law reviewed *de novo* and the findings of fact reviewed for clear error, in the light most favorable to the prevailing party."  *United States v. De La Cruz Suarez*, 601 F.3d 1202, 1213 (11th Cir. 2010).  Our review of the record reveals no error regarding the wiretap authorizations.

Section 2518—titled "Procedure for interception of wire, oral, or electronic communications"—requires that "[e]ach application for an order authorizing or approving the interception of a wire, oral, or electronic communication under this chapter . . . include . . . a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(1)(c).

6

Section 2518(3)(c) similarly provides that "[u]pon such application the judge may enter an ex parte order . . . authorizing or approving interception of wire, oral, or electronic communications . . . if the judge determines on the basis of the facts submitted by the applicant that— . . . normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."  *Id.* § 2518(3)(c).

The purpose of these "necessity" provisions in § 2518 is to "ensure[] that law enforcement does not use electronic surveillance when less intrusive methods will suffice."  *United States v. Perez*, 661 F.3d 568, 581 (11th Cir. 2011); *accord United States v. Van Horn*, 789 F.2d 1492, 1496 (11th Cir. 1986).  But the statute "does not 'foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted.'"  *Perez*, 661 F.3d at 581 (quoting *United States v. Alonso*, 740 F.2d 862, 868 (11th Cir. 1984)); *accord Van Horn*, 789 F.2d at 1496.  Instead, it "require[s] the Government to show why alternative measures are inadequate for 'this particular investigation.'"  *Perez*, 661 F.3d at 581 (quoting *United States v. Carrazana*, 921 F.2d 1557, 1565 (11th Cir. 1991)).  In evaluating whether the Government met its burden, courts must read supporting affidavits "in a 'practical and commonsense fashion,' and the district court is clothed with broad discretion in its consideration of the application."

7

*Alonso*, 740 F.2d at 868 (citations omitted) (quoting *United States v. Brick*, 502 F.2d 219, 224 n.14 (8th Cir. 1974)).

Here, the prosecutor applied for and obtained a wiretap authorization from the district court to intercept Jackson's telephone conversations. The initial 10-page wiretap application was supported by a 52-page affidavit from Agent Russell. As the investigation expanded and additional authorizations were sought for different telephone numbers, lengthy supporting affidavits were again provided to the district judge.

In this case, as in *Perez*, the supporting affidavits described other investigative techniques already employed that had failed to uncover critical evidence. *See id.* at 582. For example, the affidavit in support of the initial application included eleven pages explaining the inadequacies of other investigative techniques. Agent Russell explained in that affidavit why other investigative techniques—such as use of undercover agents, cooperating sources, witness interviews, grand jury subpoenas, physical surveillance, and trash searches—were either not productive or not feasible in this investigation. The affidavits thus satisfied the necessity requirement of § 2518.

8

And as the magistrate judge explained in his report recommending denial of the motions to suppress, the *Leon*[13] good faith exception applies to wiretap applications and authorizations. *See United States v. Malekzadeh*, 855 F.2d 1492, 1497 (11th Cir. 1988). Here, there is no basis to conclude that the officers did not act in good-faith reliance on the judicially authorized wiretaps. Thus, even if the wiretap affidavits and authorizations were deficient, suppression of the evidence would not have been warranted.

### 2. Traffic Stop Evidence (McCree only)

McCree's argument that the district court erred in denying his motion to suppress evidence seized during the traffic stop fares no better. He argues that the evidence should have been suppressed because there was not probable cause for the traffic stop, but he fails to establish error.

Again, the district court's denial of the motion presents a "mixed question of law and fact," and we review the rulings of law *de novo* and the findings of fact for clear error. *De La Cruz Suarez*, 601 F.3d at 1213. "Absent clear error, we are bound by the district court's findings of fact and credibility choices at the suppression hearing." *United States v. Thompson*, 928 F.2d 1060, 1063 (11th Cir. 1991) (quoting *United States v. Roy*, 869 F.2d 1427, 1429 (11th Cir. 1989)).

---

[13] *United States v. Leon*, 468 U.S. 897 (1984).

9

"[L]aw enforcement 'may stop a vehicle when there is probable cause to believe that the driver is violating any one of the multitude of applicable traffic and equipment regulations relating to the operation of motor vehicles.'" *United States v. Cooper*, 133 F.3d 1394, 1398 (11th Cir. 1998) (quoting *United States v. Strickland*, 902 F.2d 937, 940 (11th Cir. 1990)). "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis"; "the constitutional reasonableness of traffic stops" does not "depend[] on the actual motivations of the individual officers involved." *Whren v. United States*, 517 U.S. 806, 813 (1996).

McCree does not—because he cannot—quarrel with the principles espoused in *Whren*. He instead argues the facts—also an uphill battle. He maintains that he did not commit a traffic violation prior to the stop. But at the suppression hearing, the officers who stopped McCree testified that they observed McCree change lanes on the interstate without using a turn signal—an Alabama traffic infraction. And the magistrate judge specifically found the testimony of both officers credible. There is no basis to question the district court's credibility assessment here. *See Cooper*, 131 F.3d at 1398. Thus, McCree's argument on this point is without merit.

10

### B. Constructive Amendment/Variance on Count One (Hawkins only)

Next, Hawkins argues that the evidence presented at trial on the conspiracy charge diverged from the allegations of the superseding indictment, resulting in a constructive amendment or a variance. We are not persuaded.

"The Fifth Amendment guarantees that a defendant can be convicted only of crimes charged in the indictment." *United States v. Holt*, 777 F.3d 1234, 1261 (11th Cir. 2015). "[W]hen the evidence at trial . . . deviate[s] from what is alleged in the indictment, either a constructive amendment or a variance can arise." *Id.* "A constructive amendment occurs 'when the essential elements of the offense contained in the indictment are altered to broaden the possible bases for conviction beyond what is contained in the indictment.'" *Id.* (quoting *United States v. Narog*, 372 F.3d 1243, 1247 (11th Cir. 2004)). A variance, on the other hand, "occurs when the facts proved at trial deviate from the facts contained in the indictment but the essential elements of the offense are the same." *Id.* (quoting *Narog*, 372 F.3d at 1247).

Hawkins bases his constructive amendment and variance arguments on a text message and phone call to Ware in which Hawkins proposed the purchase of a kilogram of cocaine from a new supplier. Hawkins argues that the message and phone call suggest a different conspiracy from the one charged, thus broadening

11

the superseding indictment (constructive amendment) and demonstrating multiple conspiracies under an indictment alleging only a single conspiracy (variance). But neither a constructive amendment nor a variance occurred here.

It is true that the Government's principal theory at trial was that Hawkins's role in the charged conspiracy was that of a distributor for Ware. But the fact that Hawkins informed Ware that Hawkins had the opportunity to acquire a kilogram of cocaine from a different supplier did not "broaden the possible bases for conviction beyond what is contained in the indictment" so as to constructively amend it. *Id.* The superseding indictment charged Hawkins with conspiring with Ware and several other named defendants as well as "others known and unknown to the Grand Jury," to distribute cocaine. The action of a distributor informing his supplier of a potential new source of supply is consistent with the underlying scheme and with there being a common goal in the conspiracy. *See United States v. Reeves*, 742 F.3d 487, 497–99 (11th Cir. 2014). The text message and phone call were "evidence that properly was admitted as intrinsic to the charged offenses." *Holt*, 777 F.3d at 1261. The admission of the conversations, and the Government's reliance on them, did "not impermissibly broaden the indictment to include other crimes." *Id.*

12

Nor did either the admission of, or reliance on, this evidence effectuate a material variance.  The text message and phone call did not deviate from the facts contained in the superseding indictment.  Again, Hawkins's suggestion to Ware that a kilogram of cocaine be purchased is not inconsistent with the charged conspiracy.

In sum, Hawkins's constructive amendment and variance arguments are without merit.

### C.  Agent Russell's Testimony (Hawkins and McCree)

That brings us to the matter of Agent Russell's trial testimony.  Hawkins and McCree argue that Agent Russell "went far beyond permissible testimony" when he repeatedly provided "speculative interpretive commentary" on the meanings of phone calls and text messages and gave his opinions about what was occurring during and in between those communications.  We agree.

Agent Russell—a lieutenant with the Montgomery Police Department assigned to the DEA's High Intensity Drug Trafficking Area task force from 2011 through 2015—was both the lead case agent in the investigation and the Government's principal witness at trial.  He provided extensive testimony about the drug trade, the investigation, and the intercepted phone calls, and—contrary to

13

the Government's puzzling contention otherwise—he was presented as an expert to the jury.

Hawkins and McCree acknowledge that experienced narcotics agents may testify as experts to help juries understand the drug business, codes, and jargon; indeed, this Court has repeatedly so held. *See, e.g.*, *Holt*, 777 F.3d at 1265 ("'The operations of narcotics dealers are a proper subject for expert testimony under [Federal Rule of Evidence] 702,' and 'an experienced narcotics agent may testify as an expert to help a jury understand the significance of certain conduct or methods of operation unique to the drug distribution business.'" (quoting *United States v. Cesar Garcia*,[14] 447 F.3d 1327, 1335 (11th Cir. 2006))). But that is not the problem here.

Much of Agent Russell's trial testimony "was not specific to his interpretation of drug codes and jargon" and "went beyond interpreting code words to interpret conversations as a whole." *United States v. Emmanuel*, 565 F.3d 1324, 1336 (11th Cir. 2009). During his extensive time on the witness stand, Agent Russell "interpreted" unambiguous language, mixed expert opinion with fact testimony, and synthesized the trial evidence for the jury. His testimony strayed

---

[14] This opinion cites three cases named *United States v. Garcia* and two named *United States v. Freeman*. For clarity, the first names of the defendants are included in the citations of these cases.

14

into speculation and unfettered, wholesale interpretation of the evidence.

Allowance of this testimony constituted plain error.

### 1. *The Testimony*

The issue of Agent Russell's testimony first arose about a month before trial, when the prosecutor filed a motion in limine indicating that he intended to call Agent Russell and two other agents to testify as "experts of narcotics investigation" at trial. At a pretrial hearing on that and other motions, the district judge granted the motion as a general matter, stating, "All I'm saying right now is the government may call experts for appropriate purposes at this trial. Fair enough?" There were no objections to that benign ruling, and the district court added that "specific contour type objections" could be made at trial. Of the three expert witnesses listed in the motion in limine, Agent Russell was the only one to testify, and his testimony became the dominant feature of the trial.

The district court addressed the scope of Agent Russell's testimony several more times during the trial. Agent Russell was the first witness, and soon after his testimony began, the Government tendered him "as an expert in cocaine and cocaine base trafficking." Counsel for Hawkins objected on the ground that the Government had not established "cocaine and cocaine base trafficking" as "a recognized field of expertise." Without expressly ruling on the objection, the

15

district judge responded: "The question really becomes this:  Would his opinions be helpful to the trier of fact?  Any objection to him stating opinions on the stand and let the jury determine what to make of those opinions?"  Counsel for Hawkins yielded, but McCree's counsel then objected to Agent Russell giving "any opinions involving an ultimate issue."  The judge ruled that "a policeman who's got that much experience can testify about opinions and his experience as it relates to the trade of drug trafficking."

After the judge's ruling, the prosecutor offered that Agent Russell's opinions were admissible as expert testimony under Federal Rule of Evidence 702 or, "as a fallback," under Rule 701, which pertains to lay opinion testimony.  The prosecutor explained that Agent Russell "has a wealth of experience in an area that would assist the [jury] in evaluating this particular case" by putting things in perspective.  According to the prosecutor, Agent Russell would provide that perspective by explaining "coded language, the amounts of drugs, the tools of the trade, [and] where drugs come from."  After gaining the prosecutor's assurance that he would not ask Agent Russell to state an opinion as to whether Hawkins or McCree had committed a crime, the judge announced to the jury:  "I am going to recognize that the current witness may testify based upon his experience and knowledge with respect to technical subject matters, including law enforcement

16

investigation of drug trafficking matters, drug trafficking language, and other matters that are related to those."

The prosecutor then continued his questioning of Agent Russell, and some of Agent Russell's testimony was—as promised—appropriate expert opinion about cocaine dealing and drug jargon based on his training and experience.  For example, he described, as a general matter, how cocaine is "cooked" and the use of "cutting agents," and he explained that code words for money include "bread," "cornbread," and "paper."

But it did not take long for Agent Russell's testimony to stray from its projected and permitted scope, going well beyond interpreting code and explaining drug trafficking practices.  For example, Agent Russell opined that when Hawkins told Ware, "Don't let this get away, man," this meant:  "Evidently, Mr. Hawkins thought that this was a good deal.  The quality of the cocaine was good.  The price was about $1,000 cheaper than what Carlos Ware was paying to Carlos Bogan at this time of the investigation."  And sometimes Agent Russell "interpreted" plain language—stating, for example, that "he can get as many as he wants" means that "[he] has a lot of cocaine."

Before the jury returned from its lunch break on the first day of trial, counsel for McCree pointed out to the court that the questioning of Agent Russell was

17

deviating from what was discussed at the earlier sidebar conference. The judge advised the prosecutor to "keep it cleaner" and reminded the jury of Agent Russell's expertise: "You'll remember that we're in the midst of the direct examination of the government's initial witness. I have stated from the bench that he can testify as to technical matters because he has experience related to law enforcement, drug interdiction, and drug investigations."

Agent Russell's testimony then resumed, and the prosecutor repeatedly asked him to testify "based on [his] training, experience, and . . . expert opinion." Sometimes the prosecutor combined Agent Russell's "expertise" and "knowledge of this investigation" into the same question. In response to the prosecutor's questions, Agent Russell continued to tell the jury what he thought intercepted text messages and conversations—not just code words—meant. Occasionally, he went so far as to tell the jury what he thought Hawkins, McCree, and others were doing, providing an overview of the evidence in the case under the guise of providing an "expert opinion." For example, when asked for his "expert opinion" about what he "fe[lt] 'making a move'" meant, Agent Russell responded, "Trying to make a move is Carlos Ware informing Mr. Hawkins that he's getting ready to travel to Georgia to reup on his cocaine supply."

18

And sometimes Agent Russell speculated. For instance, when asked what "having something in the pot" meant "in [his] expert opinion," Agent Russell responded that "[t]hat *could be* referring to cooking the cocaine." Additionally, he continued to "interpret" ordinary language—stating that "that's the last one" means "he doesn't have any more dope," and that "giving it to people" means "[d]istributing narcotics."

Agent Russell also purported to identify the speakers in conversations "based on [his] training, experience, and knowledge of this investigation." He occasionally gave an "expert opinion" about who he "fe[lt]" was being referenced in a conversation or what he "believed" was happening. And he identified Hawkins's "other phone number" "based upon [his] training and experience and knowledge of this investigation, as well as [his] expert opinion." He also gave an "expert opinion" that the name "Wall" heard in a recorded conversation referred to McCree.

Additionally, Agent Russell provided narrative responses and summaries of the evidence. Presented with a text message and asked, "Based on your training, experience, and expert opinion, what's going on here?" Agent Russell answered:

> Referencing the previous conversation you just played, when Carlos Ware asked him if he could send it to him, that was going back to the other conversation where he was trying to collect the money from Mr.

19

Hawkins.  And this text is from the 414-7988 number of Mr. Hawkins to Carlos Ware.  He's telling Mr. Ware that his boy is on his way to him, basically meaning whoever is going to be running the money from Mr. Hawkins to Mr. Ware is on the way to Mr. Hawkins.  And then he will be at you in a minute.  So once the boy gets to Mr. Hawkins, he's going to send him straight to Mr. Ware with the money.

And when asked for an "expert opinion as to the particular conduct that is going on now when Ware and McCree are discussing someone crossing the line," Agent Russell gave his opinion:

Yes, sir.  At this point in the investigation, Carlos Ware is back in Georgia and has purchased or has arranged to obtain either—I think it was two kilograms of cocaine from Carlos Bogan at this time.  Kyon Hall is the subject who went and met Carlos Ware in Georgia and was driving back with the cocaine at this time.

These are but two examples of Agent Russell's many unfettered narrative responses in which he gave improper expert opinion testimony.

When Agent Russell's testimony resumed on the second day of trial, matters did not improve.  Immediately, the prosecutor asked Agent Russell to "tell us, based upon your expert opinion, what we're seeing here based upon the traffic stop that occurred on May 23rd, 2015."  Agent Russell responded with a lengthy narrative, synthesizing the evidence for the jury.  Throughout Agent Russell's second day of testimony, the prosecutor asked him to opine about what he "thought

20

was taking place," "thought was happening," or "assessed as happening during" text messages and phone calls.

Agent Russell again speculated at times, stating, for example, "We believed he was referring to cocaine." He also provided "expert opinion" about "whose name [he] fe[lt he] heard" on a recording—stating it was Hawkins's nickname. And he repeatedly gave an "expert opinion" that "Wall" referred to McCree. Throughout Agent Russell's testimony, the prosecutor continued to refer to both Agent Russell's "expert opinion" and his "knowledge of this investigation" within the same question. And in his closing arguments, the prosecutor told the jury, "This case is just as Officer Russell told you," and urged the jurors to "evaluat[e] . . . the evidence as Mr. Russell told you."

### 2. Plain Error

We typically review a district court's decisions regarding the admissibility of evidence and testimony for abuse of discretion. *Emmanuel*, 565 F.3d at 1335. But issues not preserved below are reviewed "for plain error only." *Id.* at 1333. In this case, the tepid objections made by defense counsel at trial were not sufficient to preserve the issue of the propriety of Agent Russell's testimony for abuse-of-discretion review. Although there were rumblings of concern about the phrasing of questions, counsel neither persisted in objecting nor moved to strike any of Agent

21

Russell's problematic testimony when it was given. The plain error standard thus applies. And the unusual and egregious circumstances here constitute plain error requiring reversal.

To prevail on plain error review, a party must, as an initial matter, establish three conditions. "First, there must be an error that has not been intentionally relinquished or abandoned. Second, the error must be plain—that is to say, clear or obvious. Third, the error must have affected the defendant's substantial rights." *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1904 (2018) (quoting *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1343 (2016)). If these first three conditions are met, a court "may exercise its discretion to notice a forfeited error, but only if the error seriously affected the fairness, integrity, or public reputation of judicial proceedings." *United States v. Hernandez*, 906 F.3d 1367, 1370 (11th Cir. 2018) (quoting *United States v. Rodriguez*, 398 F.3d 1291, 1298 (11th Cir. 2005)). "Meeting all four prongs is difficult, 'as it should be.'" *Puckett v. United States*, 556 U.S. 129, 135 (2009) (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 83 n.9 (2004)). But here we do not struggle to conclude that all four prongs are satisfied.

First, neither Hawkins nor McCree intentionally relinquished or abandoned the erroneous admission of Agent Russell's improper testimony. They made some

22

objections at trial, though they did not object on all of the bases they now assert before us.

Second, the error in the admission of Agent Russell's speculative interpretive testimony is clear and obvious. While the deciphering of coded language is helpful to the jury and therefore permissible, interpretations of "conversations as a whole"—such as those made by Agent Russell throughout his testimony—are not appropriate. *See Emmanuel*, 565 F.3d at 1336 (noting that "[a]t times, [the agent's] testimony went beyond interpreting code words to interpret conversations as a whole" but finding the error harmless in light of the other evidence); *accord United States v. Dukagjini*, 326 F.3d 45, 55 (2d Cir. 2003); *United States v. Mallety*, 496 F. App'x 984, 989 (11th Cir. 2012).

Nor was it proper for Agent Russell to speculate about what was transpiring in phone calls and messages or to "interpret" uncoded, ordinary language. *See, e.g.*, *United States v. Torralba-Mendia*, 784 F.3d 652, 660 (9th Cir. 2015) ("The testimony merely restated the obvious, and was not helpful."); *United States v. Vera*, 770 F.3d 1232, 1242 (9th Cir. 2014) ("[A]n officer may not testify based on speculation . . . or interpret unambiguous, clear statements."); *United States v. Haines*, 803 F.3d 713, 734 (5th Cir. 2015) (finding testimony was admitted in error where agent "offere[d] his own interpretation of language that was well within the

23

province of the jury to interpret" and "ventured into speculation, usurping the jury's function, which is to draw its own inferences from the evidence presented"); *United States v. York*, 572 F.3d 415, 423 (7th Cir. 2009) ("'Interpretations' of unambiguous words or phrases that are plainly within the jury's understanding . . . would not assist the trier of fact to understand the evidence or to determine a fact in issue . . . . Instead, they would merely put an expert gloss on a conclusion the jury should draw." (further internal quotation marks omitted) (citation omitted)). Through his testimony, Agent Russell repeatedly summarized the evidence and "effectively spoon-fed his interpretations of the phone calls and the government's theory of the case to the jury, interpreting even ordinary English language," *United States v. Marcus Freeman*, 730 F.3d 590, 597 (6th Cir. 2013)—all of which presents a problem.

The Government takes the position that Agent Russell did not testify as an expert, conceding error if he did. It attempts to avoid a finding of error by arguing that Agent Russell's testimony was instead lay opinion—reasoning that if characterized as lay testimony, there was no error in allowing it. This position is flawed because the record refutes the Government's contention that Agent Russell testified only as a lay witness. And even if Agent Russell's testimony were viewed as lay, it was nevertheless improperly presented.

24

Agent Russell was paraded before the jury as an expert.  As recounted earlier, the prosecutor repeatedly asked Agent Russell for his "expert opinion." And the district court told the jury several times that Agent Russell was permitted to testify "based upon his experience and knowledge with respect to technical subject matters."  These announcements are at odds with the Government's insistence that Agent Russell's testimony was lay opinion admissible under Rule 701 rather than expert opinion under Rule 702.  Rule 702 provides that a witness "qualified as an expert by knowledge, skill, experience, training, or education" may provide opinion testimony where "the expert's . . . technical[] or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).  And Rule 701 makes clear that lay opinion testimony is admissible only if it "is . . . not based on . . . technical[] or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701(c). The district court not only gave interim instructions that Agent Russell's opinions were based on his "experience and knowledge with respect to technical subject matters," but also—despite the Government's assertion to the contrary on appeal— included this circuit's pattern instruction on expert testimony when charging the jury.

Moreover, much of Agent Russell's troubling testimony would be improper

25

as lay testimony even if offered as such.  This is because "a case agent testifying as a lay witness may not explain to a jury what inferences to draw from recorded conversations involving ordinary language.  At that point, his testimony is no longer evidence but becomes argument."  *Marcus Freeman*, 730 F.3d at 598 (citation omitted)); *see also United States v. Kilpatrick*, 798 F.3d 365, 380–81 (6th Cir. 2015) (same); *United States v. Kevin Freeman*, 498 F.3d 893, 905 (9th Cir. 2007) ("[T]he interpretation of *clear* statements is not permissible, and is barred by the helpfulness requirement of both Fed. R. Evid. 701 and Fed. R. Evid. 702." (quoting *United States v. Dicker*, 853 F.2d 1103, 1109 (3d Cir. 1988))); *United States v. Yuri Garcia*, 413 F.3d 201, 210 (2d Cir. 2005) ("[O]pinion testimony, whether offered by a lay witness pursuant to [Rule 701], or by an expert pursuant to [Rule 702], . . . is not properly received 'merely [to] tell the jury what result to reach.'" (last alteration in original) (quoting Fed. R. Evid. advisory committee's notes on 1972 proposed rules)); *cf. Marcus Freeman*, 730 F.3d at 600 ("For the same reasons that many of [the agent's] opinions were not helpful to the jury as lay testimony under Rule 701(b), and therefore inadmissible, his opinions would not have been helpful as expert testimony under Rule 702(a).").

And even those portions of Agent Russell's testimony that could be considered proper lay testimony were rendered improper by the indiscriminate

26

merging of fact testimony with expert testimony throughout his time on the witness stand.  Indeed, that merging exacerbated the problem here.  "[H]is overall presentation as a dual fact-expert witness without further demarcation or explanation to the jury was in error."  *United States v. Rios*, 830 F.3d 403, 416 (6th Cir. 2016).

This Court has recognized, as have other circuits, that "particular difficulties, warranting vigilance by the trial court, arise when an expert, who is also the case agent, goes beyond interpreting code words and summarizes his beliefs about the defendant's conduct based upon his knowledge of the case."  *Emmanuel*, 565 F.3d at 1335 (quoting *Dukagjini*, 326 F.3d at 53).  The dangers presented by such "dual testimony" include, among others:  that it confers upon the agent an "aura of special reliability and trustworthiness," *Dukagjini*, 326 F.3d at 53 (quoting *United States v. Young*, 745 F.2d 733, 766 (2d Cir. 1984) (Newman, J., concurring)); that the agent could "stray from applying reliable methodology and convey to the jury the witness's 'sweeping conclusions' about appellants' activities," *id.* at 54; and that the jury could conflate the witness's expert and fact witness testimony, *United States v. Danilo Garcia*, 752 F.3d 382, 391–92 (4th Cir. 2014).  And as noted in *Emmanuel*, "such expert testimony may unfairly provide the government with an additional summation by having the expert interpret the evidence, and may come

27

dangerously close to invading the province of the jury." *Emmanuel*, 565 F.3d at 1335–36 (citing *Dukagjini*, 326 F.3d at 54).

In this case, these dangers became reality. Agent Russell's testimony placed the imprimatur of "expertise" on his view of the facts of the case. His testimony "went to the crux of the Government's case, and the jury may well have afforded unusual authority to the agent, who was presented as having expertise, as well as knowledge beyond that available to the jury." *United States v. Grinage*, 390 F.3d 746, 752 (2d Cir. 2004) (citation omitted); *accord Yuri Garcia*, 413 F.3d at 215 ("[W]hen a jury hears that an agent's opinion is based on the total investigation, there is a risk that it may improperly defer to the officer's opinion, thinking his knowledge of pertinent facts more extensive than its own.").

In sum, Agent Russell provided improper testimony by summarizing evidence, interpreting plain language, and drawing inferences from the evidence that the jury must draw (or not draw) for itself. And even if Agent Russell provided only lay testimony—an assertion wholly refuted by the record—his testimony was still largely improper. Put simply, it matters not how Agent Russell

28

or his testimony is classified.  Expert or lay, the testimony was improper, and admitting it constituted clear and obvious error.[15]

Turning to the third plain error element, "the error 'must have affected the outcome of the district court proceedings' such that, absent the error, there is a reasonable probability of a different result."  *Hernandez*, 906 F.3d at 1370 (quoting *Rodriguez*, 398 F.3d at 1299).  Under the circumstances of this case, "there is a reasonable probability of a different result" absent the error because of the importance of Agent Russell's testimony to the Government's case.  *Cf. Danilo Garcia*, 752 F.3d at 392–98 (vacating and remanding under abuse-of-discretion standard after concluding that error in allowance of dual-role testimony was not harmless); *Grinage*, 390 F.3d at 751, 752 (vacating and remanding where phone calls interpreted by agent "were the principal evidence implicating" the defendant and "[t]he central focus in the testimony was on the agent's interpretations of the calls").

The fact that the Government's case hinged on Agent Russell's extensive testimony distinguishes this case from those that have recognized error in the admission of similar testimony but then found reversal not warranted in view of

---

[15] We are not the first court to find plain error under circumstances such as these.  *See, e.g.*, *Vera*, 770 F.3d at 1246; *Torralba-Mendia*, 784 F.3d at 659; *United States v. Lopez-Medina*, 461 F.3d 724, 745 (6th Cir. 2006).

other evidence. *See, e.g.*, *Emmanuel*, 565 F.3d at 1336 (concluding that in light of the "substantial evidence" against the defendant, "opinion testimony that went beyond interpreting drug codes and jargon was merely cumulative and was not essential to the jury's verdict"); *Mallety*, 496 F. App'x at 989 ("[P]ermitting this testimony was not plain error because, in light of the volume and nature of the evidence showing [that the appellant] conspired to distribute and possess cocaine, [the agent's] testimony did not affect [the appellant]'s substantial rights."). Here, Agent Russell was the principal prosecution witness, testifying for more than half of the three-day trial. His testimony occupies over two hundred pages of trial transcript—not reflecting the time taken to play audio recordings while he was on the stand. The testimony of the other eight trial witnesses combined is contained in fewer than one hundred transcript pages. In fact, no other single witness's testimony took more than seventeen pages. Agent Russell was the only witness who testified about Hawkins. Without Agent Russell's testimony, there would not have been sufficient evidence to convict Hawkins on any of the counts against him. And although ample evidence was presented against McCree through other witnesses on the felon-in-possession-of-a-firearm charges against him (Counts Eighteen and Twenty-Six), absent Agent Russell's testimony there was not sufficient evidence to support the drug-related charges against McCree (Counts

30

One, Fifteen, Sixteen, and Seventeen).  There can be no doubt that Agent Russell's improper testimony affected the outcome of the trial.

Having found the first three plain error conditions satisfied, we must assess whether "the error seriously affected the fairness, integrity, or public reputation of judicial proceedings" such that we should exercise our discretion to correct it. *Hernandez*, 906 F.3d at 1370 (quoting *Rodriguez*, 398 F.3d at 1298).  The determination whether to exercise discretion to correct the error "inherently requires 'a case-specific and fact-intensive' inquiry." *Rosales-Mireles*, 138 S. Ct. at 1909 (quoting *Puckett*, 556 U.S. at 142).  We conclude that this is the rare case warranting this extraordinary relief.

"The purpose of [this fourth element of plain error review] is to analyze whether a 'reasonable citizen would[] bear a rightly diminished view of the judicial process and its integrity if' the court refused to correct the alleged error." *United States v. Munksgard*, 913 F.3d 1327, 1339 (11th Cir. 2019) (Tjoflat, J., dissenting) (alteration in original) (quoting *Rosales-Mireles*, 138 S. Ct. at 1908).  "It's about institutional legitimacy." *Id.*

In analyzing this element, "the United States Supreme Court has often rested its determination on the amount of evidence incriminating the defendant, regardless of the error." *United States v. Monroe*, 353 F.3d 1346, 1357 (11th Cir.

31

2003) (alteration in original) (citing *United States v. Cotton*, 535 U.S. 625, 632 (2002), and *Johnson v. United States*, 520 U.S. 461, 470 (1997)); *see also United States v. Stout*, 667 F.2d 1347, 1354 (11th Cir. 1982) ("Application of this standard necessarily requires consideration of all circumstances at trial including the strength of the evidence against defendants.").  Because of Agent Russell's dual role as case agent and expert, the volume of his testimony, and the importance of that testimony to the Government's case, admission of his improper testimony "seriously affected the fairness, integrity, and reputation" of the trial.  *Cf. United States v. Lopez-Medina*, 461 F.3d 724, 745 (6th Cir. 2006) ("We conclude that permitting police officers to testify as experts in their own investigations and give opinion testimony on the significance of evidence they have collected, absent any cautionary instruction, threatens the fairness, integrity, and public reputation of judicial proceedings, regardless of whether the defendant is actually innocent.").

The conflating of lay and expert testimony intensified the effect of this error on the fairness and integrity of the proceedings.  Where, as here, the questions to a witness merge expert and lay components, they "explicitly mix[] [the witness's] dual bases of knowledge, leaving the jury to wonder who was testifying, [Russell]-the-expert or [Russell]-the-case-agent."  *York*, 572 F.3d at 426; *accord Haines*, 803 F.3d at 732.  In *York*, the Seventh Circuit emphasized that "if the witness testifies

32

as both a fact witness and an expert witness in the same trip to the witness stand . . . , the government and the court must take some special precautions to make clear for the jury when the witness is relying on his expertise and when he is relying only on his personal knowledge of the case." 572 F.3d at 421; *accord Haines*, 803 F.3d at 732; *see also United States v. Smith*, 919 F.3d 825, 837 (4th Cir. 2019) (suggesting safeguards such as "requiring the witness to testify at different times, in each capacity; giving a cautionary instruction to the jury regarding the basis of the testimony; . . . or having counsel ground the question in either fact or expertise while asking the question" (quoting *Danilo Garcia*, 752 F.3d at 392)). No such precautions were taken in this case. Neither the prosecutor nor the district court made any effort to separate or explain to the jury what was lay testimony and what was expert testimony. Although the district court instructed the jury that it could decide whether to accept Agent Russell's testimony, that was not enough under these circumstances. No one—court, prosecutor, or defense counsel—appeared to recognize the need for special procedures in light of Agent Russell's dual roles.

Agent Russell's improper opinion testimony permeated the trial and tainted the process. Were we to leave this plain error uncorrected, we would be suggesting to prosecutors in this circuit that overzealous presentation of improper

33

testimony will be tolerated and to district courts that they need not be vigilant in ensuring the integrity of trials involving this type of testimony. If such testimony were allowed, "there would be no need for the jury to review personally any evidence at all. The jurors could be 'helped' by a summary witness for the Government, who could not only tell them what was in the evidence but tell them what inferences to draw from it." *Grinage*, 390 F.3d at 750. Fundamental notions of fairness and justice forbid us from countenancing such a procedure. We again "'decline to prohibit categorically the use of case agents as experts,' [but] we [again] admonish prosecutors that the better practice is to avoid doing so." *United States v. Holden*, 603 F. App'x 744, 752 (11th Cir. 2015) (quoting *Dukagjini*, 326 F.3d at 56).

In sum, because the Government's case depended on Agent Russell's improper testimony for all counts against Hawkins and for all but two counts against McCree, we vacate Hawkins's convictions on Counts One, Nine, and Fourteen as well as his sentence. Additionally, we vacate McCree's convictions on Counts One, Fifteen, Sixteen, and Seventeen as well as his sentence. We remand for a new trial on these vacated counts and for resentencing of McCree.

## D. Sufficiency of the Evidence (Hawkins only)

34

Hawkins also argues that the evidence presented at trial—even including Agent Russell's testimony—was insufficient as to each of the three counts against him. "Evidence is sufficient to support a conviction if a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." *Holt*, 777 F.2d at 1259 (quoting *United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009)). We find no merit to Hawkins's assertions that the evidence admitted at trial was not sufficient to support his convictions because a reasonable trier of fact certainly could have found him guilty given the evidence presented. But because Agent Russell's testimony—which constituted the majority of the evidence against Hawkins as to all three counts—was admitted in error, we remand for a new trial.

35

### E.  Sentencing Issues

Hawkins and McCree each challenge their sentences.  Both argue that the district court misapplied the sentencing guidelines and that the sentences were substantively unreasonable.  But because we vacate all of Hawkins's convictions and his sentence, we need not address his sentencing-related complaints.

And although we do not disturb McCree's convictions on the felon-in-possession offenses (Counts Eighteen and Twenty-Six), we do vacate his sentence, which took into account the drug-related offenses.  We therefore do not reach McCree's sentencing arguments either.

## III.  Conclusion

In conclusion, because of Agent Russell's extensive improper testimony, we vacate Hawkins's convictions on Counts One, Nine, and Fourteen of the superseding indictment and the sentence imposed against Hawkins.  We also vacate McCree's convictions on Counts One, Fifteen, Sixteen, and Seventeen of the superseding indictment and the sentence imposed against McCree on all counts.  We affirm McCree's convictions on Counts Eighteen and Twenty-Six. We remand for a new trial of Hawkins on Counts One, Nine, and Fourteen; for a new trial of McCree on Counts One, Fifteen, Sixteen, and Seventeen; and for

36

resentencing of McCree on Counts Eighteen and Twenty-Six.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED**.