**NOT FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 24-12557
_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

SHELITHA RENEE ROBERTSON,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:22-cr-00432-SDG-JEM-1

_____

Before ROSENBAUM, BRANCH, and GRANT, Circuit Judges.

PER CURIAM:

After a trial, Shelitha Robertson was convicted of wire fraud, conspiracy to commit wire fraud, and money laundering. She and

her co-conspirator, Chandra Norton, submitted fraudulent applications for loans for the Paycheck Protection Program ("PPP"), a COVID-era relief program designed to make it possible for businesses to keep employees on payroll. Robertson and Norton submitted applications for relief claiming that their businesses employed hundreds of people. But in fact, most of the businesses were non-functioning and employed no one. In total, they secured over $14 million in funding before the banks who administered the program on behalf of the Small Business Administration ("SBA") detected the scheme and froze their accounts.

Norton, who was Robertson's attorney and best friend, accepted a plea deal with prosecutors and was sentenced to 18 months in prison and 3 years of supervised release. At Robertson's trial, Norton testified that Robertson directed her and encouraged her to submit the applications. A jury found Robertson guilty on all counts, and the judge sentenced her to 87 months in federal prison and three years of supervised release. Robertson now appeals, challenging the sufficiency of the evidence, several of the district court's evidentiary rulings, and the district court's sentencing and restitution order.

After careful review, we conclude that the evidence to support Robertson's conviction was sufficient, and the district court did not err in its challenged rulings. Accordingly, we affirm.

### I.    Facts and Procedural History[1]

A grand jury indicted Shelitha Robertson for conspiring with her associate, Chandra Norton, to fraudulently obtain millions of dollars in PPP loans from lending banks, which were guaranteed by the SBA, during the COVID-19 pandemic.[2]  The indictment alleged that Robertson and Norton submitted fraudulent PPP applications for several businesses that Robertson owned, including Atlanta Custom Motors, LLC ("ACM"), the Renee Group, MO Griggs Contracting, Inc. ("Mo Griggs"), and Tritan, Inc.

#### A.  Background of the Scheme

At the time the scheme began, Norton was an attorney and close associate of Robertson.  Robertson, in turn, was the president of the Renee Group, a state- and local-government-contracting business.

Robertson and Norton learned about the government's PPP on a call with a representative from SunTrust Bank in March 2020.  Congress authorized this program at the height of the COVID-19 pandemic to provide loan assistance to businesses to encourage them to keep employees on the payrolls and permit them to deduct certain business expenses like rent, mortgages, and utilities.

---

[1] We recite the evidence from the trial in the light most favorable to the verdict.  *See United States v. Godwin*, 765 F.3d 1306, 1319 (11th Cir. 2014).

[2] Norton waived her right to prosecution by indictment and consented to proceeding by information, so she was separately charged.  ECF Nos. 1, 2, *United States v. Norton*, Case No. 1:20-cr-00297-SDG (N.D. Ga. Aug. 14, 2020).

The SunTrust Bank representative explained to Robertson and Norton how to obtain the necessary documentation to apply for these loans, including the IRS filings and payroll documentation they would need to submit in support of their loan applications.

After the call, Robertson suggested to Norton that obtaining money fraudulently through this program could be easy. She told Norton that there "was no way in the world [the banks] can pull all of that information and review it fast."

Then Robertson and Norton began preparing applications for PPP loans for Robertson's businesses, even though none of them had employees except the Renee Group. In support of these applications, Robertson and Norton created false documentation purporting to substantiate the monthly payroll and expenses at Robertson's entities. This included false financial documents purporting to be from the IRS and other banks. They did this by creating false IRS form 941Xs for several quarters in 2019 to make it look like each company had dozens of employees.

For example, the PPP loan applications claimed that ACM had 118 employees, when in fact it had none. Mo Griggs claimed to have 133 employees. And Tritan claimed to have eighty-three. The only semi-legitimate business was the Renee Group, which had between eight and thirteen employees. But Renee Group's PPP loan claimed it had ninety-three employees. Each of the loan applications contained Robertson's initials certifying that the business was in operation as of February 15, 2020, and had the stated number of employees on payroll.

Between April and May 2020, Norton and Robertson submitted four PPP applications for Robertson's companies.  At trial, Norton testified that she prepared and submitted all these applications except for the Renee Group application, with Robertson's knowledge.  Robertson edited, signed, and submitted the Renee Group application herself.  Norton also said that Robertson directed her to create fake email addresses for the companies to make them look legitimate.

During the same period, Norton also filed five fraudulent PPP applications for companies she controlled.  Robertson knew Norton submitted those false applications.

Several of those applications reused the same documents Robertson had provided, or contained identical information to those submitted, for Robertson's companies.

In May 2020, four of Robertson's PPP applications were approved and more than $7 million was deposited into accounts she controlled.  Around the same time, Norton's applications for her separate set of companies were approved, and Norton also received around $7 million.  In total, Robertson and Norton secured nearly $15 million in fraudulent loans.

Robertson then spent the funds on personal goods, including a diamond ring worth over $128,000.  Norton also loaned Robertson $400,000 in PPP proceeds to pay down luxury-car debt.  Robertson later used Mo Griggs Contracting PPP funds to send $50,000 to her daughter and repay Norton's $400,000 loan.

In late May 2020, the banks noticed the scheme. On May 28, Robertson realized that her Bank of America account with ACM funds had a balance of negative $888,888. Later that day, Robertson got a voicemail explaining that her account had been flagged for fraud.

The next day, two of Norton's accounts were frozen. Robertson texted Norton to delete her texts and emails about the scheme.

On June 9, Robertson told Norton that they "don't both need to go down for this" and promised to protect Norton's family if the authorities came after her.

Norton learned that Robertson had told another person that Norton was solely responsible for the scheme. After that point, Norton began recording calls with Robertson.

As investigators closed in on Norton, Robertson tried to cover her tracks. In late June, she called her banker, Sylvia Shiverdecker, saying she had done nothing wrong but still wanted to repay her loans.

By June and July 2020, Robertson had repaid the banks all PPP funds she had received. For her part, Norton couldn't refund all the money that she received in PPP funds. In sum, the two refunded most of the $14 million they had received but were unable to refund approximately $4 million to the SBA.

B. Indictment and Trial

In August 2020, Norton was charged with conspiracy to commit wire fraud. She ultimately accepted a plea deal and was sentenced to eighteen months in prison with three years of supervised release.

A couple years later, in December 2022, a grand jury indicted Robertson on one count of conspiracy to commit wire fraud under 18 U.S.C. § 1349 (Count One), three substantive wire-fraud counts under 18 U.S.C. §§ 1343 and 2(a) (Counts Two through Four), and one count of money laundering under 18 U.S.C. §§ 1957 and 2 (Count Five).

Robertson pled not guilty, and the case proceeded to trial. Norton was the government's primary witness.

### 1. The Government's Case

During Norton's testimony, the government introduced certain recordings that Norton had made of Robertson after the banks had flagged the pair's accounts as potentially fraudulent. The government played the recording of a June 10, 2020, phone call between Norton and Robertson.

During this call, Norton and Robertson spoke in ambiguous terms. According to Norton, they did so because they were paranoid that government investigators were secretly listening to their phone conversations (Norton was, indeed, secretly recording her conversations with Robertson). The government asked Norton, "[W]hy didn't you just say explicitly what you were talking about?" And Norton replied, "[A]t this time we know full well that we have both been detected. Both of our accounts, three of our accounts

had been frozen, one of hers and two of mine. So there was no denying what was happening. And so we are not being forward in our conversations. . . . I guess we were kind of thinking about what happens in the movies. We don't know if we're being recorded . . . [s]o we're trying to have a conversation . . . without being specific about what we are talking about."

In another recorded phone call from June 22, 2020, Norton told Robertson she was panicking because the banks were investigating her for fraud. Robertson responded by repeatedly encouraging Norton to "take the Fifth." Robertson directed Norton not to "get into detail." She continued, "I don't want them to take anything you say—anything you say and try to build a bigger picture. A bigger—a deeper case. That's the reason I'm saying, say very little and take the Fifth."

Besides the recordings, the government presented witness testimony from the banks and the SBA. Kandace Zelaya, a long-time employee of the SBA, gave lay opinion testimony about the nature and purpose of the PPP.

The banks' representatives corroborated Norton's testimony. And the government presented testimony from the sales representative who sold Robertson the diamond ring, which also corroborated Norton's statements.

### 2. The Defense Case

Robertson testified in her defense at trial. She explained that she was a former police officer with the Atlanta Police Department

and later served as a public defender and member of the Law Department for the City of Atlanta.

Robertson also testified that she was the founder of the Renee Group, a company that performed water- and sewer-infrastructure repair. As Robertson admitted, Norton acted as an attorney for the Renee Group and performed accounting and legal services for the business. Besides that, Robertson also admitted that her other companies, ACM, Mo Griggs, and Tritan, had no employees.

According to Robertson, she never filled out any PPP applications. Rather, Robertson claimed, Norton prepared them on Robertson's behalf. Robertson added, "I didn't even know [the companies] could apply for PPP loans. All of that stuff was handled by Ms. Norton. I didn't have a clue. I never saw any applications for any of those companies. I never filled anything for any of those companies. I never knew that they were getting anything until the money actually showed up." Indeed, Robertson testified, Norton set up email addresses for Robertson's companies without Robertson's knowledge.

In May 2020, Robertson said, she began to receive loan funds in her accounts. She said that when the money came in, she called Norton to ask why she was getting so much money. Norton assured her that the money was legitimate, Robertson said. Robertson then admitted to using the money for personal purposes like the diamond ring and the cars.

C. Jury Verdict and Sentence

The jury found Robertson guilty on all counts. At sentencing, the district court determined that the loss amount for Robertson's crimes included PPP funds that both Robertson and Norton obtained as part of the conspiracy—a total of approximately 14.9 million dollars.

### 1.  Sentence

In preparation for sentencing, a probation officer prepared a Presentence Investigation Report. The officer applied the sentencing guidelines to determine that Robertson's base offense level should be increased by 18 levels, based on a finding that the loss amount fell between $3.5 million and $9.5 million. *See* U.S.S.G. § 2B1.1(b)(1). In so doing, the officer counted only the loss from the loans in Robertson's name—not Norton's. The government objected, arguing that the loss amount should be increased to $14.9 million, which reflected the combined amount that Norton and Robertson received in loans.

Robertson, for her part, argued that the loss amount should be zero because she had paid back all the money, and that she should not be held liable for the portion of funds that Norton obtained.

The court sided with the government. It determined that Robertson should be held liable for the full loss amount of $14.9 million. In overruling the defense's objection, the court said that on its view of the evidence, "this was jointly undertaken criminal activity."

The court explained, "There's no question in my mind that this was jointly undertaken criminal activity. I can't think of a situation—a scenario where there would be more jointly criminal undertaken activity than this one. The testimony was clear that Defendant Norton and Robertson were hand in hand in this criminal activity from day one. They coordinated. They had constant communication with each other about the loan applications. As the government noted, they each benefited from the loans that were being undertaken on behalf of one another."

Based on the total loss amount of $14,955,841, the court calculated a 20-level increase from Robertson's base offense level under the sentencing guidelines. It imposed a sentence of eighty-seven months in prison and three years of supervised release.

### 2. Restitution

During the restitution hearing, a representative from the SBA testified that the SBA incurred a loss of $4,425,002.23 as a result of the nine applications that Norton and Robertson submitted. This figure included the money that Norton could not return, plus processing fees for all the transactions.

The court held Robertson jointly and severally liable with Norton for restitution equal for the full amount of the SBA's loss.

### D. Appeal

Robertson raises several issues on appeal. First, she challenges the sufficiency of the evidence supporting her conviction. Second, she argues that the district court clearly erred in calculating

the loss determination and the restitution amount. Third, Robertson asserts that the district court committed a harmful error when it instructed the jury on deliberate ignorance.

Fourth, she challenges several of the district court's evidentiary rulings. In particular, Robertson contends that the district court abused its discretion in (1) admitting testimony from one of the witnesses for the SBA as lay testimony; (2) allowing Norton to provide explanatory testimony about the recordings; and (3) permitting the government to use summary exhibits.

For the reasons we explain, we conclude that the evidence sufficiently supports Robertson's conviction and that the district court committed no reversible error.

## II.    Discussion

### A.  The record sufficiently supports the jury's verdict.

#### 1.  Standard of Review

When we review a ruling for sufficiency of the evidence, we "view[] the evidence in the light most favorable to the government, with all reasonable inferences and credibility choices made in the government's favor." *United States v. Sosa*, 777 F.3d 1279, 1289 (11th Cir. 2015) (quotation marks omitted). Our Court "will not overturn a conviction" on sufficiency grounds "unless no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Wright*, 392 F.3d 1269, 1273 (11th Cir. 2004) (quotation marks omitted).

#### 2.  Analysis

Robertson cannot meet the high standard for setting aside a jury verdict.

To recap, the jury convicted Robertson of conspiracy to commit wire fraud under 18 U.S.C. § 1349 (Count One); wire fraud under 18 U.S.C. §§ 1343 and § 2(a) (Counts Two through Four); and money laundering under 18 U.S.C. § 1957 and § 2.

> a.  Wire Fraud and Conspiracy to Commit Wire Fraud

A conviction for wire fraud requires proof of two elements: the defendant (1) intentionally participated in a scheme or artifice to defraud another of money or property; and (2) used or caused the use of interstate wires for the purpose of executing the scheme or artifice. *United States v. Rodriguez*, 732 F.3d 1299, 1303 (11th Cir. 2013).

To establish a qualifying scheme, the government must prove the defendant made a material misrepresentation or omission—that is, the kind of false statement or omission that has the tendency to influence a decisionmaker. *See United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009).  Besides this, to satisfy the first element, the government must show that the defendant intended to defraud. *United States v. Bradley*, 644 F.3d 1213, 1239 (11th Cir. 2011).

As for the elements of conspiracy to commit wire fraud, the government must show that (1) two or more persons agreed to a common and unlawful plan to commit wire fraud as alleged in the indictment; (2) the defendant knew of the unlawful plan; and (3)

the defendant knowingly and voluntarily joined the plan. *United States v. Feldman*, 931 F.3d 1245, 1257 (11th Cir. 2019).

Ample evidence in the record supports each element of Robertson's convictions for wire fraud and conspiracy to commit wire fraud.

Before we recount it, we pause to note that, as to the wire-fraud counts, the indictment charged 18 U.S.C. § 1343 and § 2(a). As a result, the jury could have convicted under either or both of two theories: that Robertson personally committed the wire fraud or that Norton committed the wire fraud and Robertson intentionally aided and abetted it. *See* 18 U.S.C. § 2(a) (providing that someone who aids and abets a federal offense is punishable as a principal).

With that in mind, we turn to the offenses of wire fraud and conspiracy to commit wire fraud. We begin with the first element of wire fraud—the defendant intentionally participated in a scheme or artifice to defraud another of money or property. The record amply shows that Robertson made material misrepresentations of fact or aided and abetted in such material misrepresentations of fact in connection with the PPP applications. For starters, Robertson herself admitted that the applications contained false information and that all but one of her companies had zero employees. Plus, she signed a fraudulent application on behalf of the Renee Group and transmitted it to the banks.

This information was materially misleading to the administrators of the PPP program, including representatives from the

banks. Specifically, the applications induced the banks to deposit nearly 15 million dollars into Norton and Robertson's accounts. For these same reasons, this evidence also supports the inference that Robertson intended to defraud the PPP program.

As for the second element of wire fraud, Robertson stipulated that the disbursements involved the use of interstate wires.

When it comes to the wire-fraud and conspiracy counts, the only real question at trial was whether Robertson knew what Norton was doing and encouraged it. But the evidence adduced at trial supports the jury's conclusion that she did.

The jury saw and heard lots of evidence that Robertson not only knew about the scheme but was in fact its architect. Norton herself testified to that. Norton recalled that she frequently worked for Robertson as an attorney—Robertson was essentially her boss. And at trial, the government presented emails that Robertson sent to Norton, providing her with documents Norton could use to create false supporting materials for the PPP applications.

Robertson herself testified, too. She claimed that when millions of dollars landed in her bank accounts, she took Norton's word for it that the money was legitimate—even though she had no reasonable basis to do so. The jury was free to disbelieve her and "conclude the opposite of [her] testimony [was] true." *United States v. Brown*, 53 F.3d 312, 314 (11th Cir. 1995) (quotation marks omitted). And other parts of Robertson's testimony supported the jury's finding that Robertson intentionally stole money from the

government through the PPP applications—including that she spent the money on jewelry and luxury cars. *See United States v. Maurya*, 25 F.4th 829, 841 (11th Cir. 2022) (evidence suggesting that a defendant "knowingly received far more money than he could have expected from ordinary distributions" supported his wire-fraud-conspiracy conviction).

Beyond that, when the banks and government investigators began asking questions, Norton, in a panic, called Robertson. The jury listened to a recording of the call and heard Robertson repeatedly order Norton to "take the Fifth" because she didn't want the government to be able to build a "bigger case." A reasonable jury could conclude that Robertson tried to convince Norton not to disclose her role in the scheme.

Robertson points us to a case, *United States v. McCarrick*, 294 F.3d 1286 (11th Cir. 2002), which she asserts requires us to conclude that the evidence here was insufficient. She's incorrect.

There, McCarrick requested SBA loan funds to buy (among other things) a spray-paint booth for his business. 242 F.3d at 1288. Ultimately, though, because of events that occurred after he applied, McCarrick used the funds for other parts of his business and did not purchase the spray-paint booth. *Id.* at 1288–89. We held that no rational jury could find that McCarrick intended to defraud the government at the time that he applied for the SBA loans. *Id.* at 1291. That was so, we said, because the only evidence in the case probative of McCarrick's intent to defraud related to events that occurred after McCarrick submitted the applications, meaning that

no reasonable juror could find intent to defraud at the time of application. *Id.*

This case is nothing like *McCarrick*. Here, the evidence reflects a fraudulent intent before Norton filed the applications. Robertson and Norton learned about the program from a call with a bank representative, and Norton testified that Robertson was the one who recognized that the PPP was vulnerable to fraud. Robertson and Norton discussed plans to prepare fraudulent applications, and Robertson forwarded her materials that Norton needed to create false supporting documents.

In this case, the government may have asked the jury to make inferences, but it also produced a "pile of documents and figures" that "gave the jury ample evidence" to support Robertson's conviction. *Maurya*, 25 F.4th at 841.

### b.  Money Laundering

To prove the money laundering charge against Robertson, the government must establish five elements: "(a) the defendant knowingly engaged or attempted to engage in a monetary transaction; (b) the defendant knew the transaction involved property or funds that were the proceeds of some criminal activity; (c) the property had a value of more than $10,000; (d) the property was in fact proceeds of [in this case, wire fraud]; and (e) the transaction took place in the United States." *United States v. Iriele*, 977 F.3d 1155, 1183–84 (11th Cir. 2020).

The record sufficiently supports Robertson's money-laundering conviction. Norton testified and Robertson confirmed that,

before returning the PPP money, Robertson spent $128,000 on a diamond ring from Guven Fine Jewelers in Buford, Georgia. This evidence allowed the jury to find that transaction was worth more than $10,000 and occurred in the United States. Norton also testified that Robertson told her she used the ACM PPP loan funds to purchase the diamond ring, and Norton was there when Robertson wrote the check from the ACM account. Plus, as we've explained, a reasonable jury could find from the evidence that PPP proceeds derived from Robertson's wire-fraud scheme. This is enough to support the money-laundering conviction.

### B. The district court's jury instruction on deliberate ignorance did not result in harmful error.

Next, Robertson argues that the district court erred in instructing the jury that the knowledge element of her offenses could be established through proof of deliberate ignorance.

### 1. Standard of Review

We review de novo the legal correctness of a decision to give a deliberate-ignorance instruction. *See Maurya,* 25 F.4th at 842 ("Challenges to jury instructions present questions of law, so we apply de novo review.").

### 2. Analysis

An instruction on deliberate ignorance is appropriate if the evidence would allow a reasonable jury to infer that "the defendant was aware of a high probability of the existence of the fact in question and purposely contrived to avoid learning all of the facts in

order to have a defense in the event of a subsequent prosecution." *United States v. Rivera*, 944 F.2d 1563, 1571 (11th Cir. 1991) (quotation marks omitted). We've also said that "where the evidence supports both actual knowledge and deliberate ignorance, the instruction is properly given." *United States v. Arias*, 984 F.2d 1139, 1143 (11th Cir. 1993) (quotation marks omitted).

Robertson claimed not to know what Norton had done. Yet Robertson admitted that she had concerns about why she was receiving so much money for companies that were non-operational, but said she simply took Norton's word that everything was fine. A reasonable jury could have concluded that when Robertson received seven million dollars from the government to support the payroll of non-operational businesses with no employees, she should have realized that something was amiss. Even if she somehow wasn't aware of the scheme, a reasonable jury could conclude that the bank account deposits "put her on notice of the fraudulent activity." *United States v. Arias*, 431 F.3d 1327, 1335 (11th Cir. 2005). That is, based on this record, a reasonable jury could have determined that if Robertson did not have actual knowledge of the crimes that was so only because she deliberately tried to avoid that knowledge. Under these circumstances, the court did not err in giving the deliberate-ignorance instruction.

But even if we assumed error in giving the instruction, any error would have been harmless. "[I]nstructing the jury on deliberate ignorance is harmless error where the jury was also in-

structed and could have convicted on" an alternative theory of actual knowledge. *Steed*, 548 F.3d at 977; *see also United States v. Hill*, 643 F.3d 807, 855 (11th Cir. 2011). That's true here—the jury received both instructions and could have reasonably concluded that Robertson had actual knowledge.

C. The district court's evidentiary rulings did not result in reversible error.

Robertson challenges several of the district court's evidentiary rulings. She argues that the district court erred by admitting as lay testimony the testimony of an SBA employee; by allowing Norton to interpret statements that she and Robertson made during a recorded phone call; and by allowing the government to use several summary charts.

1. Standard of Review

Generally, we review evidentiary rulings for abuse of discretion. *See United States v. Perez-Oliveros*, 479 F.3d 779, 783 (11th Cir. 2007). The decision to admit lay opinion testimony falls within that general rule.[3] *See United States v. Jayyousi*, 657 F.3d 1085, 1102 (11th Cir. 2011). So does a decision to permit the use of summary charts. *See United States v. Norton*, 867 F.2d 1354, 1362 (11th Cir. 1989).

---

[3] The government argues that because the defense, at trial, did not object to the full portion of Norton's testimony that it now seeks to challenge on appeal, we should review this ruling under a plain-error standard. We decline to review the ruling for plain error because we interpret defense counsel's objection at trial to have adequately addressed all of Norton's testimony explaining the recordings.

### 2. Norton's Explanation of the Recording

First, Robertson challenges the district court's decision to allow Norton to explain to the jury the recording of a conversation between herself and Robertson. During Norton's testimony, the government introduced certain recordings that Norton had made of Robertson, after the banks had flagged the pair's accounts as potentially fraudulent. One such recording the government played was of a June 10, 2020, phone call between Norton and Robertson.

At the beginning of the call, Norton said that she received a fraud alert from Chase and was panicking. Robertson encouraged her to calm down. Then they discussed a voicemail that Robertson received from Bank of America about a fraud alert. Robertson said, "I don't think they're going to do anything once they get theirs back." She continued, "It shouldn't have been done" and that she was in the process of giving "it" back.

Norton admitted, "My problem is I can't even return it all." Robertson replied, "What's the shortfall?" Norton responded, "Five."

After the recording played, Norton offered context for the recording. She explained what she and Robertson were talking about (the PPP fraud scheme) and why they were not referring directly to the applications or the disbursements.

Robertson now argues that it was improper to permit Norton to testify as to her "interpretation or opinions concerning what the parties were saying."

The Federal Rules of Evidence govern the admissibility of witness testimony, including lay opinion testimony. Rule 701 provides, "If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."

In support of her argument that the court abused its discretion in allowing Norton's explanations of the recording, Robertson cites *United States v. Hawkins*, 934 F.3d 1251, 1262 (11th Cir. 2019). In *Hawkins*, we held that the district court abused its discretion in permitting a DEA agent to interpret "coded language" used in wiretap recordings of two individuals accused of drug trafficking. *Id.* at 1262. We held that "[m]uch of [the DEA agent's] trial testimony 'was not specific to his interpretation of drug codes and jargon' and went 'beyond interpreting code words to interpret conversations as a whole.'" *Id.* at 1261 (quoting *United States v. Emmanuel*, 565 F.3d 1324, 1336 (11th Cir. 2009)).

*Hawkins* has no application here. In *Hawkins*, the DEA agent testified far beyond the scope of his own personal and firsthand knowledge. He testified to the meaning of conversations that he did not personally participate in. *Id.* at 1263–64. Here, by contrast, Norton had direct, first-hand knowledge of the conversation and did not rely on any kind of technical expertise. The district court properly admitted her testimony under Rule 701. *See United States*

*v. Awan*, 966 F.2d 1415, 1430 (11th Cir. 1992) (holding that a witness's testimony was based on his personal perception and admissible as lay testimony because he "was actually present and participating in the conversation and observing what was happening at the time[.]").

### 3. Admission of SBA Agent Zelaya's Testimony as Lay Opinion

Robertson next argues that the district court erred in admitting the testimony of Kandace Zelaya, a trial attorney for the Small Business Administration, as lay testimony under Federal Rule of Evidence 701 rather than as expert testimony under Federal Rule of Evidence 702.

At the beginning of its case in chief, the government called Zelaya, who had worked as a trial attorney in the SBA's Office of General Counsel for the Office of Litigation for thirty-two years. Zelaya testified that she was part of a team at SBA that helped draft all the guidance and application forms for the PPP. She also testified to the eligibility requirements for the program. Defense counsel objected that Zelaya was testifying as an expert witness and that the defense did not receive notice of her testimony or an expert disclosure. The district court overruled the objection.

On appeal, Robertson argues that admission of Zelaya's testimony as a lay witness prejudiced her because Zelaya effectively testified as an expert without providing the required notice under Federal Rule of Criminal Procedure 16(a)(1)(G). Under that rule,

the government must provide the defendant with a written summary of "any testimony that the government intends to use under" Rule 702 in advance.

Rule 702 defines expert testimony as occurring when the witness is qualified and their specialized knowledge will help the jury. *See* Fed. R. Evid. 702. The opinion must also be based on sufficient facts, reliable methods, and a reliable application of those methods to the case. *Id*.

When a witness with professional experience at an institution like the SBA testifies about the procedures and operations of that institution, we generally don't consider that testimony to be expert testimony. For example, in *United States v. Hill*, 643 F.3d at 841–43, a defendant argued that the district court abused its discretion in allowing several representatives from financial institutions to answer questions about what their banks would have done in different hypothetical situations, based on their knowledge of processes and procedures at their banks. We explained that a witness does not have to draw on specialized or expert knowledge to testify about processes and procedures of an institution at which she works. *Id*. at 842.

Similarly, the record here reflects that most of Zelaya's testimony concerned information about the background, origin, and processes of the PPP. Her testimony in these respects provided information that is widely known and publicly available. As for the testimony she gave about the specific processes the PPP uses to vet and approve loans, that came from her own personal experience as

24-12557            Opinion of the Court            25

a long-time employee of the SBA.  In short, Zelaya's testimony did not involve "scientific, technical, or other specialized knowledge." Fed. R. Evid. 702.

> ### 4. The Government's Use of Summary Charts

Robertson next challenges the court's decision to permit the government to use summary charts while certain witnesses were testifying at trial.

As the government explained, SBA Agents Sara Oliver and Elizabeth Gass created these charts to summarize and illustrate the voluminous phone and bank records related to Robertson and Norton's case.  The government sought to introduce them as exhibits, but defense counsel objected under Federal Rule of Evidence 1006. The district court sustained the objection but permitted the government to use the charts as demonstrative aids.  At the close of its case-in-chief, the government withdrew its request to admit the charts into evidence and relied on them solely as demonstrative exhibits.  The government again clarified that it did not want to introduce the charts into evidence after both sides rested.[4]

Robertson now asserts the district court admitted the summary charts into evidence in violation of Federal Rule of Evidence

---

[4] In her brief on appeal, Robertson appears to suggest that the court admitted the summary charts into evidence.  The record reflects that the district court did not admit the charts into evidence as exhibits.

1006(a), which governs the use of summary charts that are admitted into evidence. But the record reflects that the district court did not admit them into evidence, so Rule 1006 does not apply.[5]

As demonstrative aids, the summary charts were "pedagogical device[s]" used to "clarify and simplify complex testimony or other information and evidence[.]" *United States v. Milkiewicz*, 470 F.3d 390, 397 (1st Cir. 2006) (citation omitted) (interpreting Rule 611(a), which governed demonstrative charts before 2024).

The district court did not err in permitting their use.

★ ★ ★ ★

In sum, the district court did not abuse its discretion.

D. The district court did not err in its sentencing and restitution orders.

Finally, Robertson challenges the district court's sentencing and restitution orders. She asserts that she should not be liable for loss attributable to Norton's loan applications. Standard of Review

We review the district court's determination of loss amount for clear error. *See United States v. Whitman*, 887 F.3d 1240, 1246 (11th Cir. 2018). We review the determination of restitution value for abuse of discretion. *United States v. Robertson*, 493 F.3d 1322, 1330 (11th Cir. 2007) (quotation marks omitted).

---

[5] Robertson concedes that many of the documents underlying the summary charts were admissible and does not put forth any argument for why the remaining documents were inadmissible.

### 2. Loss Amount

Robertson argues that the district court should have adjusted the loss amount to zero for purposes of her sentencing, urging that she repaid all the loans and was not responsible for Norton's fraud.

Robertson maintains that because she returned the money before the government detected her fraud, the loss amount should be credited accordingly. She bases her argument on *United States v. Foster*, 878 F.3d 1297 (11th Cir. 2018). There, we held that "if the defendant returned any money to the victims . . . before the fraud was detected, the loss amount must be reduced by the fair market value of the returned money[.]" *Id.* at 1306 (cleaned up). We disagree that *Foster* applies here.

The Sentencing Guidelines define the time of detection as the earlier of the time that the victim or government agency discovered the offense, or the time the defendant knew or reasonably should have known that the offense had been detected. U.S.S.G. § 2B1.1 cmt. n.3(D)(i). Here, Robertson returned the money only after the banks froze her accounts and began investigating her for fraud.

As the district court explained, the banks are statutorily obligated to detect and report fraud to the government, so they act as agents of the government for purposes of wire-fraud investigations. On the district court's view, for purposes of the sentencing guidelines, the date on which the banks discovered the scheme was the date on which the government agency discovered the scheme.

So, the court concluded, Robertson failed to return the money before the offense was detected.

The district court also rejected Robertson's arguments that she was not responsible for Norton's crimes because the record amply supported a finding that Robertson and Norton were engaged in a joint conspiracy.

We find no clear error in either of these determinations. Robertson was not entitled to credit for repayment of the funds. Several of our sister circuits have likewise concluded that a defendant fails to repay funds when she does so only after a bank or other victim discovers the loss. *See, e.g., United States v. Kirchner*, 161 F.4th 266, 281 (5th Cir. 2025) (no credit for returning money after investors detected fraud); *United States v. Dullum*, 560 F.3d 133, 138 (3d Cir. 2009) (no credit for returning money repaid after bank froze accounts). And as we have explained, the record soundly supported the district court's individualized findings about the scope of the conspiracy. Norton worked for Robertson as her attorney; Robertson and Norton discussed the PPP's vulnerability; they discussed the loans and made plans for submitting applications together; and they even wired the proceeds to each other.

The district court reasonably concluded that Robertson, who was a participant in the conspiracy, was responsible for the losses resulting from reasonably foreseeable acts of her co-conspirator, Norton, in furtherance of the conspiracy. *See United States v. Baldwin*, 774 F.3d 711, 727 (11th Cir. 2014); *Whitman*, 887 F.3d at 1248–50.

### 3. Restitution

The Mandatory Victim Restitution Act of 1996 requires a defendant convicted of fraud to pay restitution to the victims of her offense. 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii). The government bears the burden of proving the amount of a loss by a preponderance of the evidence. *Id.* § 3664(e).

"[A] district court does not exceed its authority by ordering a defendant to pay restitution for losses which result from acts done in furtherance of the conspiracy of which the defendant is convicted." *United States v. Obasohan*, 73 F.3d 309, 311 (11th Cir. 1996) (per curiam).

As to restitution, Robertson argues that the district court failed to make specific findings about her liability for the conspiracy with Norton. But again, she is incorrect. The record supports the district court's determination. As we've noted, the record shows that Robertson and Norton coordinated extensively, through texts, emails, and phone calls in furtherance of the scheme. Robertson does not contest the district court's finding that the SBA lost $4,425,002.23 from the conspiracy. And Special Agent Sara Oliver of the Small Business Administration testified to the loan-processing fees that the lenders charged the SBA, along with other costs the SBA incurred because of the conspiracy, resulting in the total restitution finding. The district court had authority to hold Robertson jointly and severally liable for the full amount of restitution resulting from the conspiracy. *United States v. Grady*, 18 F.4th 1275, 1289 (11th Cir. 2021).

★  ★  ★  ★

We find that the district court did not err in its loss amount or restitution calculations.

### III.    Conclusion

We affirm the district court's ruling in full.

**AFFIRMED.**